Filed 7/1/14  In re Angelina P. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANGELINA P. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> CAROLINE P., <br><br>     Defendant and Appellant. | A139793 <br><br> (San Mateo County  Super. Ct. Nos. 80745, 80746, 80747, 80748) |

Appellant Caroline P. is the mother of four daughters who have been dependents of the San Mateo Juvenile Court since 2010.  She appeals from the order granting the motion made by respondent San Mateo County Human Services Agency pursuant to Welfare and Institutions Code section 388 (section 388), which allowed the three younger daughters to make a 30-day out-of-state visit with their long-time caregiver and eventual guardian.  She also appeals from the order appointing the caregiver guardian of the three younger daughters.  We affirm both orders.

## BACKGROUND

The able briefs filed by the parties demonstrate that they are familiar with the lengthy and sometimes tortuous history of these dependencies.  The orders which appellant has brought here for review are obviously only the most recent of orders

1

generated in those proceedings. In light of these circumstances, it is not necessary to summarize the extensive proceedings in detail. We focus on the orders and the issues discussed in appellant's arguments.

The minors were originally declared dependent children of the Los Angeles Juvenile Court in 2010. That same year the dependencies were transferred to San Mateo. Eventually, also in 2010, reunification services to appellant were terminated, and in 2011 long-term foster care was adopted as the permanent plan for the minors.

It appears that much of the controversy stems from appellant's lack of sympathy with the religious beliefs of the children's caregiver, who is appellant's cousin and also an adherent of the Church of Jesus Christ of Latter Day Saints. In April 2013, respondent advised the court that the three youngest children "have resided in the same placement home since February 26, 2010 and with the same primary caregiver since April 11, 2012 . . . . The children's eldest sibling, Angelina, recently left home on October 29, 2012, [¶] . . . [¶] has changed placements multiple times over the last five months and has not had time to establish stability in her placement." The court was further advised by respondent that appellant was living with her mother in Ohio. Respondent initially recommended that "the proposed permanent plan continue to be long-term foster care" for all the children, but after discussing the matter with the three younger children, the caseworker changed the recommendation for them to guardianship with the caregiver as guardian.

In June 2013, respondent filed a section 388 motion for the court's approval of the caregiver—who had been granted de facto parent status—taking the three youngest children for a 30-day trip ("starting July 16, 2013 and returning August 16, 2013") to Missouri, "to visit with relatives and close family friends from their church." Missouri is where the caregiver "intends to move permanently . . . with the girls if the court orders a guardianship" for them and "terminates dependency" of the eldest daughter Angelina.

Appellant's whereabouts at the time were not known. The caseworker advised the court that the three younger children were doing well, the oldest was doing better, and all—including the caregiver—were becoming exasperated with the extended

2

proceedings. According to the caseworker, the three younger children "desire Legal Guardianship and want to move with their caregiver . . . to Missouri, while Angelina appears to feel comfortable with Long Term foster care but would want the opportunity to explore if moving back with . . . her sisters is possible."

Respondent's motion was the subject of a hearing held on July 15, 2013. At the outset the court found that respondent had exercised due diligence in attempting to locate the still-missing appellant. Appellant's counsel, who did not know her whereabouts, nevertheless opposed the motion. The court heard testimony from the three younger children's caregiver about the proposed trip to Missouri. She and the children would stay in the house of a fellow church member, and check out "plenty of church historical sites." She planned on exploring job opportunities for her anticipated permanent move there. She will return with the children at the end of the 30 days. Her 18-year-old brother, a student at the University of Nebraska, may help with some driving, but "he's actually preparing to serve his mission. So he's going to be gone soon."

Appellant's counsel argued against the motion because "there's insufficient information and investigation before the court of this trip as to what the plan is, where they are going to be staying, what the situation is, whose going to be in the bedrooms, where the 18-year-old brother is going to be." The court responded: "We don't normally ask those kinds of questions when people take extended visits or vacation . . . . I get these motions all the time. And I don't inquire—we're going on a camping trip or we're going to Florida or we're going to some—no one ever gives me details about which hotel and how many beds and which relatives you are staying with."

The juvenile court prefaced its ruling by stating it found the caretaker "a credible witness." "[S]o the record is clear, the court is looking at this motion in the context of the 30-day extended visit, nothing more." The arguments of appellant's counsel "are certainly appropriate if this were something other than an extended visit." "[T]his court finds that this would be a wonderful opportunity for the children to travel to Missouri, and have a good time with [the caregiver], and all the various places that they are going to travel [to]. [¶] And the court is going to grant this . . . extended visit of 30 days.

3

[¶] The court finds that it has been proven by a preponderance of the evidence that certainly it is a change of circumstance for the family, but it is in the best interest of the children, would be promoted by this visit . . . ." The court verified that the caregiver would "make sure that Angelina can have contact with her three siblings in the next 30 days."

On August 16, 2013, respondent filed another section 388 motion seeking the court's approval of the foster parent caregiver taking the three youngest children for a second 30-day trip (August 24, 2013 to September 24, 2013) to Missouri. Appellant's location was still unknown to respondent, but she was in contact with her counsel. The motion was set for August 22, which was also the date for the selecting the children's permanent plan.

With respect to that selection, respondent requested that it be continued to October 8, 2013, and in the meantime "the children remain Dependents of the Juvenile Court." The caseworker further requested in effect that the pending section 388 motion be granted. The caseworker told the court she "would like to reiterate that the current caregiver with whom the children have received care since February 26, 2010 has demonstrated an ability to meet the various needs of the children, including the delivery of nurturance and support, an appropriate level of supervision, an ability to address racial and cultural issues, provide age appropriate discipline and foster healthy growth and development."

August 22, 2013, was the hearing on respondent's second section 388 motion. Appellant and her mother testified against a second visit. Appellant believed that the caregiver wanted the children in Missouri "for her own selfish reasons," namely "to see her own boyfriend." Appellant did not know the boyfriend and thus "I don't know if he's a [child] molester or something." On the other hand, appellant's motive was "I'm their mother, they should be by me," or, failing that, with her mother. Appellant would "rather them be in foster care than be with her." Appellant further testified that the caregiver intercepted and frustrated virtually all of her daily telephone calls to the children. According to appellant, none of the children wants to be with the caregiver in Missouri.

4

Appellant's mother testified that the children would be safer and less exposed to indecent influences if placed with her.

The caseworker testified that midway through the 30-day visit, the caregiver and the children moved from a mobile home to three-bedroom home. The two youngest children slept in one bedroom, the oldest in another. All the children told her they are happy living with the caregiver, and none wish to return to living with appellant. The caseworker favored a second 30-day visit "because they've known their caregiver. This is the most permanent home that they've been in. They love their caregiver. . . . [¶] They've thrived in her care."

The oldest (14-years-old) of the three children placed with the caregiver testified that she is happy with the placement, and has never told appellant she was unhappy with the placement. Her infrequent telephone conversations with appellant are unpleasant because "she kept on yelling at me." She and her younger sisters are in almost daily conversation with Angelina.

The caregiver testified that, on the previous 30-day visit, "We arrived July 18 in the morning and I got [a] job offer that afternoon. [¶] . . . [¶] I work for the State of Missouri in family and social services, in drug court." She does not prevent appellant from speaking with the children. Appellant has called and left threatening messages.

The court again prefaced its ruling by stating that it found appellant "not . . . to be credible at all," while the caseworker, the caregiver, and the 14-year-old were each found to be "a very credible witness." "The Court finds that the Department has clearly proven by a preponderance of the evidence that there is a change in circumstances here. . . [i]n that [the caregiver] . . . has found a new job in Missouri, she's staying in a place that has ample room . . . for the children."

"[T]he Department has also proven that this move, this 30-day request . . . is in the best interest of the children. All three children have indicated to [the caseworker], as reported in the August 22nd social studies report, that they are very happy there. I note that on page 6, it is noted that the children . . . have reported that they have overall enjoyed their visit to Missouri. The children stated they have engaged in positive

5

activities such as going to the park, swimming in fresh water lakes, going to church, and meeting new friends in their community. They maintain frequent contact with their sister Angelina . . . It's very clear that the children are very happy with [the caregiver], who has provided them with a stable, loving home, and has placed limits on what the children can and cannot do.

"So it is very clear to the court that this request for a 30-day extension is in the children's best interest.

"It was very telling to the court that Mother would rather have her children, sadly, who are thriving in [the caregiver's] care right now, she would rather yank them from this loving stable home and put them in foster care, because of the animus and anger that she has towards [the caregiver] . . . [¶] . . . [I]t speaks volumes to the degree of her bias, in the court's view, such that she can't even objectively look at the fact that her children are happy and thriving, because she has such hatred, it appears, towards [the caregiver]."

"The court is going to grant . . . the Department's request for a 30-day extension visit in Missouri."

The court then suggested, as "in everyone's best interest, to move up the date for the .26 hearing, so that . . . it would be within the 30 days. . . . [¶] . . . [¶] . . . rather than have the Department . . . file another 388 for another 30-day extension." With the agreement of all parties, the court set the hearing for September 16.

The caseworker advised the court in a written report for the permanent plan selection hearing that appellant was currently living in Ohio with her mother. A check of the caregiver's brother produced "no reported criminal history." The caseworker recommended that "the children maintain contact with their sister Angelina. Angelina is the oldest child and observing her role in this family she appears to be the caregiver for her sisters. Angelina has made the difficult yet mature decision to want what's best for her sisters and that is permanence with their caregiver . . . even if it means they have to reside in different homes . . . . Since traveling out-of-state, the children have been able to maintain contact with Angelina, and they all plan to continue to maintain a close level of contact" even while living apart.

6

As for appellant, the caseworker stated "that while the Mother loves the children to the best of her ability, it is evident that the Mother. . . continues to have inconsistent contact and communication with the children. The Mother has had a history of an unstable lifestyle, mental health issues, and involvement in abusive relationships, and possible continued substance abuse she has not addressed or resolved. While the Mother has maintained minimal contact with the children, . . . [she] has continued to make false promises that she will get her life together to get her children back but has failed to do so. [¶] . . . [¶] [T]he children have consistently reported to the court that they are happy living with their caregiver and for this reason the children deserve to be in a permanent home and should not have to put their lives on hold for family members who are not in the position to provide the appropriate care the children will need to thrive."

The caseworker's ultimate recommendation for the three younger children was as follows: "Due to the current family circumstances and due to their close relationship with each other and with their sister Angelina, this Social Worker does not propose adoption as the permanent plan at this point in time. The relative caregiver would like to form a legal relationship with [the three younger children] and each of the children would like to permanently reside with the caregiver. Although the caregiver has stated her desire to adopt them throughout the course of this case, she recognizes that she can help the children achieve permanency by becoming their legal guardian. She is committed to raising each of the children through their youth and into their adulthood. She has demonstrated an ability to provide for the three children, as well as her own young siblings in her home. She provides the children with unconditional positive regard, consistency in their daily routine, and encouragement to do well and pursue their passions in life. As the children have a strong relationship with the caregiver, it appears that it would be detrimental for them to reside in any other home . . . . Therefore, the proposed permanent plan is legal guardianship with the current relative caregiver."

The September 16 hearing began with testimony from the caseworker, who was asked, "what is the status of the ICPC [Interstate Compact on Placement of Children] investigation?" She replied that the investigation had begun on August 22, and thus was

"still pending," but was expected to be completed within 30 days. Although the caseworker had no personal knowledge, she testified that the children and the caregiver reported the children were settling in to the caregiver's new home (photographs of which were provided to the court) and adjusting well to Missouri schools. Appellant testified to her opposition to a guardianship because the caregiver "abused" Angelina and "trying to play the role of the mother is wrong and to me it's evil." The caregiver still prevents the children from speaking with her, and has "brainwashed" at least one of her daughters.

Appellant's counsel argued against the caseworker's recommendation: "I would be requesting . . . that the court not order guardianship today. I think it's premature given the fact that that there is not an ICPC evaluation completed yet and that this social worker has not been to see the home and . . . we have no verification of any of the facts that the court is basing the assessment of the guardian on." The court noted that caretaker "has always been a very credible witness . . . and I presume that the Department has no reason to question her credibility or representations." Upon query from the court, appellant's counsel was unable to provide "a legal basis . . . [that] the court cannot proceed as recommended?" County counsel interjected that the issue before the court was whether a guardianship would be declared, not the children's placement, and certainly "the children aren't being placed out of state." Appellant's counsel then made "the second part of my argument would be that there should be ongoing dependency jurisdiction because of all those verifications we don't know about yet," namely, "verification the children are enrolled in school. Verification of the home and living arrangements."

At the close of evidence, a question arose whether, as the court phrased it, "I can . . . order guardianship without an ICPC out of state." The court continued the hearing for several hours in order that it, and counsel, could address whether the ICPC (and California Rules of Court rule 5.616 implementing the ICPC) applied.

When the hearing resumed, county counsel advised the court that "the ICPC is not required in order to declare the legal guardianship and terminate dependency. The purpose for the ICPC is for placement, it's not for establishing legal guardianship. These kids aren't being placed in Missouri. . . . The guardianship is being established in

California.  Guardianship established . . . and dependency dismissed.  There is no requirement for an ICPC on kids that aren't dependents."  The only reason county counsel had recommended that an ICPC investigation be initiated was "as a courtesy to counsel."  County counsel also produced a copy of the caregiver's lease for the Missouri house.  With the approval of appellant's attorney, county counsel then made an offer of proof that all of the children were enrolled and attending school.  The court also allowed the reopening of evidence so that the caregiver could testify that she did not interfere or prevent any telephone calls between appellant and the children.

Appellant's counsel continued to argue that "the evidence before the court is inadequate for the court to find in favor of a guardianship."  The court reviewed the evidence (including the offer of proof) and asked appellant's counsel, "do you have case law that says with that kind of evidence that I just referred to from an individual [the caregiver] who the court has deemed to be very credible, very responsible, her dealings with the Department have been very credible and very responsible.  She has provided photographs, she has provided information about the schools which the social worker has verified over the lunch hour.  What is it that the court is not doing as its duty to ensure that these children are safe.  What am I failing to do?

"[Appellant's counsel]:  I think that the court should order [the] San Mateo social worker to go and check out this placement new home or the court should wait for the interstate compact.

"THE COURT:  What about the argument . . . that's not necessary because the court is establishing a legal guardianship here and then the children move.  Are you saying that when someone is established as the legal guardian and then choose to leave the State of California that an ICPC is required?

"[Appellant's counsel]:  No, Your Honor.  I agree with Miss Holiber [county counsel] that that is not the case.

"THE COURT:  Okay, so why do I need an ICPC?

"[Appellant's counsel]:  I would agree if legal guardianship were established and dependency jurisdiction were terminated there would be no need for . . . an ICPC.

9

However, we are circumventing that, we are going around it, we are going through the back door here."

The court strenuously denied "trying to circumvent the law," in that "I never placed them." The court heard further argument from counsel. After making provision for visitation, the court adopted respondent's recommendations, declared the caregiver the guardian of the three younger children, and terminated their dependencies.

Appellant filed a timely notice for review of the "orders of the court . . . on August 22, 2013 and . . . on September 16, 2013."

**REVIEW**

Appellant's challenge to the order of August 22—the one granting respondent's motion for authorization of a second 30-day visit of the children to the caregiver in Missouri—would ordinarily be reviewed according to fixed and familiar standards:

"[T]he orders under our review in this case came late in the proceedings, after the court had found jurisdiction [citations], removed the child from her home and placed her in foster care [citation], undertaken the six-month and twelve-month review hearings [citation], and concluded that it was unlikely the child could be reunified with her parents [citation]. The matter was set for a hearing on selection and implementation of a permanent plan [citation], that is, for the hearing at which parental rights would ultimately be terminated, when the parents interposed a motion for a change or reconsideration of the earlier placement order. Such a motion may be brought pursuant to section 388 at any time after the minor has been declared a dependent child of the juvenile court. [Citation.]

"Section 388 provides in pertinent part that: 'Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court.'

10

"In any custody determination, a primary consideration in determining the child's best interests is the goal of assuring stability and continuity. [Citations.] 'When custody continues over a significant period, the child's need for continuity and stability assumes an increasingly important role. That need will often dictate the conclusion that maintenance of the current arrangement would be in the best interests of that child.' [Citation.]

"At a hearing on a motion for change of placement, the burden of proof is on the moving party to show by a preponderance of the evidence that there is new evidence or that there are changed circumstances that make a change of placement in the best interests of the child. [Citations.]

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability' [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*In re Stephanie M*. (1994) 7 Cal.4th 295, 316 -317.)

The determination of that motion is "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established. [Citations.] As one court has stated, when a court has made a custody determination in a dependency proceeding, ' "a reviewing court will not disturb that decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]." ' [Citations.] And we have recently warned: 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*In re Stephanie M*., *supra*, 7 Cal.4th 295, 318 -319.)

11

But appellant does not contend that the order is vulnerable because it lacks the support of substantial evidence, or that it was made with legal misapprehension of the governing legal principles. What she does contend is that the order "was a legal fiction designed to circumvent the requirements of the ICPC; as such it was an impermissible order in excess of the court's jurisdiction, necessitating reversal." However, it has been settled in California that "the ICPC governs only the 'placement' of dependent children; it does not apply to mere visits," so long as the visit does not exceed 30 days. (*In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 458-460; *In re Luke L.* (1996) 44 Cal.App.4th 670, 682; Cal. Rules of Court, rule 5.616(b)(1)(B)(ii).) And a guardianship is not a placement. (See Fam. Code, § 7901 [art. 8(a) of ICPC provides "This compact shall not apply to [¶] The . . . bringing of a child into a . . . state . . . by his or her guardian"]; *In re Summer H.* (2006) 139 Cal.App.4th 1315, 1332.)

Appellant next contends the order of September 16 adopting guardianship and appointing the caregiver as the children's guardian was "improper" and "contrary to the children's best interests" because it too "was done . . . for the purpose of circumventing the requirements of the ICPC."

The purpose of a hearing held pursuant to Welfare and Institutions Code section 366.26 (what the juvenile court here called "the .26 hearing") is to select a permanent plan for dependent children after reunification efforts have failed. (Welf. & Inst. Code, § 366.26, subd. (b); *In re Marilyn H.* (1993) 5 Cal.4th 295, 304.) At such a hearing, the court may order one of three alternatives: adoption (which requires the termination of parental rights), guardianship (which usually entails termination of the dependency), or long-term foster care. (Welf. & Inst. Code, §§ 366.26, subd. (c)(1), 366.3, subds. (a)-(d).) There is a split of authority as to whether the alternative selected is reviewed for substantial evidence or abuse of discretion (see *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351-1352), but there is no need to align with one view or the other. Appellant acknowledges, as she did to the juvenile court, the body of authority holding that "the ICPC . . . does not apply to . . . guardians." Thus, the standard of review is irrelevant.

According to the logic which appellant does not question, the 30-day visit authorized by the court's August 22 order is impregnable, and the selection of guardianship has no ICPC significance.

It might be thought that the juvenile court ought to have waited for completion of what at the September 22 hearing was called "the ICPC investigation." Appellant did not seek to have the guardianship order stayed (see Welf. & Inst. Code, § 395; Cal. Rules of Court, rule 5.595) until the investigation had been completed. And it should not be forgotten that the children had been in dependencies for more than four years, and their " 'needs . . . for permanency and stability' " (*In re Stephanie M.*, *supra*, 7 Cal.4th 295, 317) was obviously pressing. Receipt of the results of that investigation will still involve the court in its supervision of the remaining dependent, Angelina, and if that report furnishes sufficient ground, the guardianship of the other children may be revoked and dependency jurisdiction may be resumed, with the goal of a new permanency planning hearing. (See Welf. & Inst. Code, § 366.3, subds. (b), (c).)

## DISPOSITION

The orders are affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Brick, J.[*]

_____
[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

13